Anthony J. Barron, Bar No. 150447
abarron@nixonpeabody.com
Gina M. Fornario, Bar No. 246619
gfornario@nixonpeabody.com
NIXON PEABODY LLP
One Embarcadero Center, 18th Floor
San Francisco, California 94111-3600
Telephone: (415) 984-8200
Fax: (415) 984-8300

Attorneys for Plaintiff
FEDERAL DEPOSIT INSURANCE CORPORATION
AS RECEIVER FOR INNOVATIVE BANK

FILED E-filing

2012 MAY 23 P 2: 48

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## CV 12 2658 LB

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INNOVATIVE BANK, <br><br> Plaintiff, <br><br> vs. <br><br> SEONG HOON HONG; DAVID CHIU; JIN YOUNG KIM (AKA JIMMY KIM); JUNG MIN MOK; YOUNG HO WON; SANGCHOL AN; CHANG K. CHANG; SUNG SANG CHO; HARRY MOOK CHOI; YONG OH CHOI; TONY HUEY; CHONG KIM; JUNG KIM; BHUPENDRA PATEL, <br><br> Defendants. | No. <br><br> **COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS NEGLIGENCE, NEGLIGENCE, AND FRAUD** <br><br> DEMAND FOR JURY TRIAL |

## **COMPLAINT**

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for Innovative Bank ("FDIC"), for its Complaint, states as follows:

-1-

## I. INTRODUCTION

1. The FDIC brings this case in its capacity as Receiver for Innovative Bank ("Innovative" or the "Bank"), pursuant to its authority granted by 12 U.S.C. § 1821, to recover losses that the Bank suffered due to the negligence, gross negligence and breach of fiduciary duty by the fourteen (14) defendants. In support of its claims, the FDIC asserts claims of not less than $7.1 million related to lending activities on eleven commercial loans ("Commercial Target Loans") and forty-three Small Business Administration ("SBA") loans ("SBA Target Loans," collectively with the Commercial Target Loans, the "Target Loans").

2. The FDIC as Receiver for Innovative Bank has the right to pursue all of the Bank's claims, including claims against each of the Defendants herein pursuant to the authority granted by 12 U.S.C. § 1821 *et seq*. Pursuant to 12 U.S.C. section 1821(d)(2), the FDIC is the successor to all claims originally held by Innovative, and of any stockholder, member, account holder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution.

3. In derogation of their duty to engage in "safe and sound" banking practices, the Innovative directors sued herein, in violation of repeated and serious regulatory warnings, were grossly negligent and in breach of their fiduciary duties by failing to supervise the lending function at the Bank.

4. By repeatedly ignoring loan policy violations that would have been apparent had even scant attention been paid to the underwriting file, the Innovative officers sued herein were negligent, grossly negligent and in breach of their fiduciary duties by repeatedly permitting unsound underwriting practices and violations of written loan policies.

5. In committing numerous breaches of their duties, the Defendants demonstrated a want of slight care under the circumstances known to them at the time, and otherwise wholly abdicated their corporate responsibilities by closing their eyes to known risks.

6. The Defendants' negligence, gross negligence, and breaches of fiduciary duties caused losses to Innovative, including those on the Target Loans. Losses on SBA Target Loans were also caused by fraud perpetrated by Officer Defendant Jin Young Kim and the gross negligence and breach of fiduciary duty by certain Defendants in hiring and retaining Jin Young Kim despite

-2-

1  numerous warnings and red flags.

2  **II.   BACKGROUND**

3      7.    Innovative was a state chartered non-member bank established on July 1, 1982 and
4  insured by the FDIC.

5      8.    Innovative was a wholly-owned subsidiary of Innovative Bancorp ("Bancorp"), a one-
6  bank holding company headquartered in Oakland, California and operated four branches in California
7  at the time it failed in April 2010.

8      9.    In or around June 2005, Innovative and Bancorp were purchased by Oakland Venture
9  Group.

10     10.    As a result of the acquisition, an entirely new Board of Directors ("Board") and
11  executive management team, including many of the Defendants, took control of the Bank.

12     11.    The Board and management thereafter undertook a rapid expansion of the Bank's loan
13  portfolio.

14     12.    After the acquisition, the Bank focused heavily on small business lending to the
15  Korean American communities in California and Washington.  By early 2006, thirty percent of the
16  Bank's total loans fell within the SBA portfolio.

17     13.    At the outset of the Bank's expansion of its SBA loan program, the Bank received a
18  premium for the origination of these loans and typically sold the 85% SBA guaranteed portion of the
19  loans into the secondary market. The Bank became heavily reliant on the premium paid to the Bank
20  at the time of origination of SBA loans to drive earnings, and did not adequately protect against their
21  downside risk exposure.  Many of the SBA loans were poorly underwritten and would not have been
22  approved had prudent banking standards been applied to those loans, or had the Defendants paid even
23  scant attention to internal red flags and regulatory warnings.

24     14.    The Bank's commercial lending program also suffered from severe underwriting
25  deficiencies that, despite numerous and serious regulatory warnings, were never adequately addressed
26  by the Defendants, and which ultimately led to losses to Innovative, including those incurred on the
27  Commercial Target Loans.

28     15.    On April 16, 2010, the California Department of Financial Institutions ("CDFI")

-3-

1   closed Innovative Bank and appointed the FDIC as receiver.

2   **III.    THE PARTIES**

3          **A.    PLAINTIFF**

4          16.    Plaintiff FDIC is identified in paragraph 1 herein.

5          **B.    DEFENDANTS**

6          17.    Director and Officer Defendant Seong Hoon Hong ("Hong") served as President and

7   Chief Executive Officer of the Bank and as a director on the Bank's Board from 2005 to 2009. He

8   also served on the Management Loan Committee ("MLC") during the period the Commercial Target

9   Loans were approved.

10         18.    Officer Defendant David Chiu ("Chiu") joined the Bank in April 2006 as Senior Vice

11  President and became Chief Credit Officer of the Bank in June 2008. He also served on the MLC

12  during the period the Commercial Target Loans were approved.

13         19.    Officer Defendant Jung Min Mok ("Mok") served as First Vice President and Senior

14  Loan Officer of the Bank from 2005 to 2009. He served as acting Chief Credit Officer in 2009. He

15  served on the MLC during the period the Commercial Target Loans were approved.

16         20.    Officer Defendant Young Ho Won ("Won") joined the Bank in 2005 as Chief Credit

17  Officer and Executive Vice President. He was appointed Senior Executive Vice President and Chief

18  Marketing Officer in 2008, and served till 2009. He served on the MLC during the period the

19  Commercial Target Loans were approved.

20         21.    Officer Defendant Jin Young Kim ("Jimmy Kim") served as Senior Vice President of

21  the Bank's SBA program from 2006 to 2009. During that time, Jimmy Kim perpetrated a fraudulent

22  scheme by which he originated, recommended, and approved the 43 SBA Target Loans which are

23  also the subject of this complaint.

24         22.    Director Defendant Sangchol (Howard) An ("An") served as a director on the Board

25  from 2005 to 2010 and acted as Chairman of the Board from February 2008 through December 2009.

26         23.    Director Defendant Chang K. Chang ("Chang") served as a director on the Board from

27  2005 to 2009.

28         24.    Director Defendant Sung Sang Cho ("Cho") served as a director on the Board from

-4-

1 | 2005 to 2009.

2 | 25. Director Defendant Harry Mook Choi ("Harry Choi") served as a director on the
3 | Board from 2005 to 2009.

4 | 26. Director Defendant Yong Oh Choi ("Yong Choi") served as a director on the Board
5 | from 2005 to 2010.

6 | 27. Director Defendant Tony Huey ("Huey") served as a director on the Board from 2007
7 | to 2010.

8 | 28. Director Defendant Chong K. Kim ("Chong Kim") served as a director on the Board
9 | from 2008 to 2010. He also served as interim President of the Bank and as a member of the MLC
10 | from February 2009 until the Bank failed.

11 | 29. Director Defendant Jung (John) Kim ("Jung Kim") served as a director on the Board
12 | from 2005 to 2009.

13 | 30. Director Defendant Bhupendra Patel ("Patel") served as a director on the Board from
14 | 2005 to 2010.

15 | 31. Collectively, the 14 defendants identified above in paragraphs 17 through 30 shall be
16 | referred to as "Defendants."

17 | **C. SUMMARY OF CLAIMS**

18 | 32. The FDIC asserts claims against Hong, Mok, Chiu and Won (the "Officer
19 | Defendants") in an amount not less than $3.8 million for losses incurred on the eleven Commercial
20 | Target Loans that were approved by the Officer Defendants in violation of safe and sound banking
21 | principles, despite regulatory warnings, and contrary to the Bank's own loan policies. As members
22 | of the MLC, Defendants Hong, Chiu, Mok, and Won each voted to approve at least seven of the
23 | eleven Commercial Target Loans that are addressed in this complaint, and they each failed to vote
24 | against a single one of those same eleven Commercial Target Loans.

25 | 33. The FDIC asserts claims against Hong, An, Chang, Cho, Harry Choi, Yong Choi,
26 | Huey, Chong Kim, Jung Kim, and Patel (the "Director Defendants") for not less than $7.1 million
27 | for their failure to supervise properly the Bank's lending function, resulting in losses to Innovative,
28 | including those incurred from the Target Loans.

-5-

34. The FDIC asserts claims in the amount of not less than $3.3 million for negligence and gross negligence against Hong and Cho for: a) failing to determine, prior to hiring Jimmy Kim as a loan officer, that he had been terminated from his previous employment at another bank for his involvement in a small business loan scheme; and b) retaining Jimmy Kim as an officer of the Bank despite serious red flags and concerns being raised about the performance of his duties.

35. The FDIC asserts claims of not less than $3.3 million for breach of fiduciary duty and for fraud against Jimmy Kim directly for his perpetration of a fraudulent scheme within the Bank's SBA program for his own financial gain.

## IV. JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

36. This Court has subject matter jurisdiction over this case, as actions in which the FDIC as receiver is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, *et seq.*, 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.

37. This Court has personal jurisdiction over Defendants who are residents of the district in which the Court is situated and/or who at all times conducted the business of the Bank in the State of California.

38. This Court has personal jurisdiction over each of the Defendants named in this action, pursuant to California Code of Civil Procedure § 410.10.

39. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the FDIC's claims occurred in this district.

## V. FACTUAL ALLEGATIONS

### A. INNOVATIVE IGNORED AND/OR INEFFECTIVELY RESPONDED TO REGULATORY CRITICISM

40. As early as 2005, soon after the Bank's ownership changed hands, the CDFI and FDIC regulators identified serious deficiencies in the lending practices and supervision of the lending function by the Bank's Board and its then new management team. The September 30, 2005, Joint CDFI and FDIC Report of Examination (the "2005 RoE") was presented to the Board and senior management on January 31, 2006. The Bank received a composite CAMELS 2 rating as a result of

-6-

that examination, but only a 3 rating for management.[1]

41. In the 2005 RoE, regulators identified critical problems that continued through the short life of the Bank under the new owners and that contributed to the Bank's ultimate failure when the Director Defendants were grossly negligent and in breach of their fiduciary duties by failing to address the issues effectively. The critical deficiencies included poor underwriting and supervision in connection with the various types of commercial lending and the failure to supervise properly the small business lending program.

42. The 2005 RoE identified "material deficiencies in underwriting and credit administration associated with the new management team, as well as loan-related deficiencies repeated from the prior examination," including overstating credit quality in connection with debt coverage ratios, loan-to-value ratios, and collateral valuation. The examiners warned that "poor underwriting was evident in nearly all of the credits reviewed," and that loan officers lacked "a fundamental understanding of loan analysis and proper loan structure." The SBA portfolio was described as having "poor oversight."

43. The examiners also noted in the 2005 RoE that the Bank's loan policy needed to be improved in a number of ways to, among other things, provide guidelines for obtaining and reviewing appraisals, afford further guidance as to when appraisals and appraisal reviews were required, distinguish between revolving lines of credit and simple lines of credit and require certified financial statements and tax returns.

44. During the presentation of the 2005 RoE to the Board and senior management on January 31, 2006, at which Won and all Director Defendants other than Huey and Chong Kim, who were not yet on the Board, were in attendance. Defendant and then Bank President Hong committed to correcting the deficiencies and promised "that there will be no repeated recommendations at the next examination."

45. By the next Joint RoE as of June 30, 2006 (the "2006 RoE"), however, regulators had

---

[1] The components of a bank's condition that are assessed in bank examinations include: (C) Capital adequacy, (A) Asset Quality, (M) Management, (E) Earnings, (L) Liquidity and (S) Sensitivity to Market Risk. The rating scale is from 1 to 5, with 1 being strongest and 5 being weakest.

-7-

downgraded the Bank to a composite CAMELS 4 rating and noted that the previously identified problems had not been resolved. The examiners again advised management to adopt appropriate bank and SBA underwriting guidelines. Management was also cautioned that it needed to correct violations of law, again including those related to appraisals, and develop and implement policies and new procedures to ensure compliance. Regulators were extremely critical of management, urging a comprehensive loan review to detect flawed underwriting. The 2006 RoE noted that management needed to improve the financial analysis in SBA credit memoranda.

46.     The regulators' findings were presented to the Board and senior management in detail at a meeting on November 8, 2006, at which Won and all Director Defendants other than Huey and Chong Kim, who were not yet on the Board, were in attendance. At that meeting, regulators told the Bank that the small business lending program was particularly risky, and that the Bank needed to establish its own lending guidelines and not just rely on SBA guidelines.

47.     Notwithstanding the severity of the criticisms leveled against the Board and senior management in the 2005 and 2006 RoE's, the problems were never addressed by the Defendants in any meaningful way.

48.     By the end of April 2007, the Bank had entered into a Cease and Desist Order with the FDIC (the "FDIC Order") and a Final Order with the CDFI (the "CDFI Order") (collectively, the "2007 Orders"). The FDIC Order was signed by all Director Defendants except Chong Kim who was not yet on the Board. The 2007 Orders listed over thirty items to address and required, among other things, that the Bank retain qualified management, correct violations outlined in the 2006 RoE, and bolster internal control policies. Board members were specifically directed to increase their participation in the affairs of the Bank and assume all responsibility for the approval of sound policies within thirty days.

49.     As of the September 30, 2007, Joint RoE, regulators continued to warn of underwriting problems, issues with credit approvals and appraisals, and problems with the small business lending program.

50.     Regulators again downgraded Innovative to a composite CAMELS 4 rating in the September 2008 RoE, noting continued poor oversight by the Board. As of September 30, 2009, the

-8-

1    Bank was downgraded to a composite CAMELS 5 rating. The Bank was closed on April 16, 2010.

2    **B. DEFENDANTS WERE NEGLIGENT, GROSSLY NEGLIGENT AND IN**
3                  **BREACH OF THEIR FIDUCIARY DUTIES BY FAILING TO ADEQUATELY FOLLOW AND ENFORCE INNOVATIVE'S LOAN POLICY**

4    51.     The Bank's general loan policy required documentation of a strong primary and
5 secondary source of repayment, analysis and documentation of the value of collateral, and
6 compliance with various collateral and balance sheet requirements.

7    52.     The Bank's general loan policy required that all loans have a clearly identified and
8 defined primary source of repayment supported with a properly completed cash flow analysis derived
9 specifically from past performance and/or projections from new startups. Projections were to be
10 carefully analyzed to meet a test of reasonableness.

11    53.     During all relevant times, the Bank's loan policy set forth the responsibilities of the
12 Bank's Directors and Officers as follows:

13    The Bank's Directors shall be responsible for:

14      a)      establishing a written loan policy and controls for the Bank that are consistent with
15             safe and sound banking practices and appropriate for the size of the Bank and the
16             nature and scope of its operations. The Board of Directors shall approve the Bank's
17             Loan Policy, review it at least annually and approve changes as warranted;

18      b)      supervising Bank management to ensure that the Bank is operated in a safe and sound
19             manner;

20      c)      requiring sufficient information so that Directors can make informed decisions on the
21             effectiveness of the Bank's loan policy; and

22      d)      ensuring that Management monitors market conditions in the Bank's lending area to
23             ensure that the Bank's loan policy continues to be appropriate for current market
24             conditions.

25    The Bank's Management shall be responsible for:

26      a)      considering both internal and external factors in the formulation of the Bank's loan
27             policy and internal lending guidelines, including: the size and financial condition of
28             the Bank; the expertise and size of the Bank's lending staff; the need to avoid undue

-9-

1    concentrations of risk; compliance with all federal and state laws and regulations,
2    including real estate-related laws, the Community Reinvestment Act, and anti-
3    discrimination laws; and market conditions;

4    b)    developing, implementing, and effectively administering formal loan standards,
5          policies, procedures, and controls;

6    c)    monitoring the loan portfolio; and

7    d)    providing the Directors with sufficient information so they can make informed
8          decisions on the effectiveness of the Bank's loan policy.

9    54.    The loan policy established a Director's Loan Committee ("DLC") and the MLC.
10   Defendants Mok, Chiu and Hong were members of the MLC from 2006 through 2009, Defendant
11   Won served from 2006 through 2008, and Defendant Chong Kim served in 2009

12   55.    The MLC approved the eleven Commercial Target Loans. The requirements of the
13   loan policy were routinely ignored by the Defendants, and the loans were approved with numerous
14   violations of the Loan Policy.

15   56.    Generally, neither DLC nor MLC approval was required for SBA loans and Defendant
16   Jimmy Kim was allowed nearly unfettered authority to originate and approve these loans.

17   57.    The approval of the Target Loans, the failure to supervise the lending functions of the
18   Bank, as well as numerous other acts of negligence, gross negligence, breaches of fiduciary duty
19   and/or other legal duties by the Defendants, were the direct and proximate cause of the Bank's losses.

20   C.    **DEFENDANTS' NEGLIGENCE, GROSS NEGLIGENCE AND BREACHES
           OF FIDUCIARY DUTIES IN FAILING TO SUPERVISE AND CONDUCT
21         LENDING FUNCTIONS IN ACCORDANCE WITH SAFE AND SOUND
           LOAN UNDERWRITING PRACTICES AND IN ACCORDANCE WITH
22         INNOVATIVE'S LOAN POLICY CAUSED THE BANK TO INCUR
23         SIGNIFICANT LOSSES**

24         1.    The Eleven Commercial Target Loans

25   58.    The eleven Commercial Target Loans were approved by the Officer Defendants on the
26   MLC notwithstanding serious underwriting deficiencies that violated safe and sound lending
27   practices and the Bank's own loan policy.

28   59.    The Director Defendants failed to supervise the MLC even though the December 2005

-10-

RoE commented on the numerous underwriting deficiencies that should have been identified by a cursory review of the credit memoranda, and noted that loan officers lacked a fundamental understanding of loan analysis and proper loan structure. Based on these regulatory warnings, the Director Defendants had a duty to obtain and review the necessary documentation to confirm that the regulators' concerns had been answered.

60.     The eleven Commercial Target Loans are as follows, by date made within each category ("CRE"=Commercial Real Estate) ("CL"=Commercial Loan) ("LOC"=Line of Credit):

| Borrower | Loan Type | Date App'd | MLC Approval | | | | | Loan Amount |
| | | | Hong | Mok | Chiu | Won | Chong Kim | |
|---|---|---|---|---|---|---|---|---|
| Sky Hopper | CRE | 4/27/07 | X | X | X | X | | $3,276,759 |
| J.Y. Kim | CRE | 6/21/07 | X | X | X | | | $325,637 |
| Serving Comm | CRE | 8/9/07 | X | X | X | X | | $1,130,997 |
| D.K. Jun | CL | 4/5/06 | | X | | X | | $120,220 |
| F. Kim | CL | 6/6/06 | | X | | X | | $169,635 |
| Silverstar | CL | 10/27/07 | X | X | X | X | | $101,991 |
| AMC Petro. | CL | 4/7/08 | X | X | X | | | $164,844 |
| Up Style | CL | 6/17/09 | | X | X | | X | $182,000 |
| Caltra | LOC | 5/24/07 | X | | X | | | $1,000,000 |
| Vineyard Tech. | LOC | 6/28/07 | X | X | X | X | | $499,732 |
| Crystal Candy | LOC | 7/30/07 | X | X | X | X | | $350,000 |

61.     Examples of underwriting deficiencies on the eleven Commercial Target Loans include the failure to verify sources of repayment, verify and analyze financials, analyze cash flow, require sufficient collateral, obtain adequate appraisals, review inventory, and analyze other debt or investments.

### a.     Sky Hopper

62.     On May 10, 2007, after the Bank had received a composite CAMELS 4 rating, the Officer Defendants Hong, Mok, Choi, and Won approved a $3.3 million loan to Sky Hopper, Investment, Inc. ("Sky Hopper"), to fund the purchase of a Chevron gas station, convenience store, and a Subway restaurant in Livermore, California. The loan was secured by a first Deed of Trust on

1  the subject property, a UCC-1 on the borrower's property, and a third Deed of Trust on the
2  guarantor's personal property. All four Officer Defendants approved the loan notwithstanding that
3  the borrower reported an operating loss on the property for the prior three years. Moreover, the
4  borrower's only prior business experience was having owned (but not operated) two dry cleaning
5  businesses. The pro forma balance sheet for the guarantor did not demonstrate sufficient net worth to
6  support the guaranty, the guarantor's financial statement was self-prepared and unverified, and the
7  underwriting analysis of the guarantor's financial statement did not take into account the fact that
8  assets were jointly held with a spouse who was not a guarantor. This loan was approved despite prior
9  regulatory warnings concerning material deficiencies in underwriting, contrary to safe and sound
10 banking principles, and in violation of Innovative's loan policies which required, among other things,
11 audited or CPA reviewed financial statements, and the approval of a complete, experienced and
12 qualified management team. The borrower's first default occurred less than a year after funding, on
13 March 27, 2008, and the formal Notice of Default was filed on March 19, 2009.

14                                **b.    J.Y. Kim**

15 63.    On June 21, 2007, the Bank extended a five-year loan in the amount of $337,500 to
16 Joseph Yuseok Kim aka Yu Seok Kim to finance the purchase of a lower level/basement commercial
17 condominium unit located in Los Angeles, California for $450,000. At the time of the loan, the unit
18 was under lease to a women's wholesale clothing business, which had a three-year lease term ending
19 October 31, 2009. The rent from the unit was identified as the primary source of debt repayment in
20 the credit memorandum, despite the fact that the existing lease expired less than half way into the five
21 year loan term. The Bank also relied on overly optimistic assumptions about the vacancy rate during
22 the term of the loan, particularly given that this was a single-tenant, basement retail space. And while
23 the Bank identified the Borrower's excess cash flow as another primary repayment source, that cash
24 flow analysis was also overly optimistic and failed to consider significant Borrower expenses. This
25 loan was approved despite prior regulatory warnings concerning material deficiencies in
26 underwriting, and contrary to safe and sound banking principles. The loan defaulted in August 2009
27 due to the loss of the tenant and the Borrower's inability to fund the loan. Despite the high risk
28 assumptions upon which the credit memorandum relied, Hong, Mok and Chiu approved the loan.

-12-

### c.  Serving Community Church

64.  On August 24, 2007, the Bank made a five-year, $1,155,000 commercial loan to Serving Community Church in Hayward, California to acquire a commercial building in Castro Valley, California to renovate as a new church location. The purchase price was $1,650,000, and the church made a $495,000 down payment from accumulated donations and specific pledges. The church had a 28 year history and approximately 150 members at the time, but stated that it expected significant growth upon purchase of the much bigger location. The credit recommendation prepared by the loan officer noted that the existing zoning on the building did not allow for church use, and that no approvals had been granted at the time of the appraisal. All four Officer Defendants approved the loan. This loan was approved despite prior regulatory warnings concerning material deficiencies in underwriting, contrary to safe and sound banking principles, and in violation of Innovative's loan policies which required, among other things, verification of a legal use for the subject property and loan proceeds. After the loan was funded and the building was acquired, the church was unable to obtain a Conditional Use Permit. The church was unable to make the required payments of over $9,000 per month because, other than fundraising for this specific building program, the Church typically had no net profit. The inability to acquire the use permit for the larger location did not allow for the assumed increases in attendance, donations and tithes. The Church was unable to pay the property taxes in 2009, and unable to fund the required loan payments after March, 2009; the loan went into default in April, 2009.

### d.  Dong Kook Jun

65.  On April 17, 2006, the Bank made a five-year, $130,000 commercial loan to Dong Kook Jun dba Union Auto Sales for the purpose of paying off $51,000 in credit card debt and providing working capital for increased inventory. Allowing approximately forty percent of the loan proceeds to be used for paying off credit card debt was an unsafe and unsound practice, as it was not linked to any revenue generating asset; yet, this issue was not even addressed in the credit memorandum. Further, the remaining portion of the loan was to support increased inventory, but inventory loans are typically for periods of twelve to eighteen months, and a five-year loan to support increased automobile inventory was an unsafe and unsound practice. The initial loan approvals also

-13-

1  failed to put protections into place such as a debtor repayment program that was appropriate for

2  accounts receivable and inventory financing, or regular inventory inspections. Mok and Won

3  approved the loan. On July 18, 2006, the same two named defendants approved a temporary

4  reconveyance allowing the borrower to refinance his single family residence and to extract

5  approximately $50,000 of the equity, resulting in the Bank losing $50,000 in equity protection

6  through that transaction. The initial loan was approved despite prior regulatory warnings concerning

7  material deficiencies in underwriting, and contrary to safe and sound banking principles. The loan

8  experienced significant performance issues starting in 2007, went into default in May, 2007, and

9  large amounts were charged off in 2008 and 2009.

10              e.      **Felix Kim**

11      66.     On June 8, 2006, the Bank extended a four-year, $200,000 loan to Felix Kim to

12  purchase a supermarket, Northside Market. The loan was secured by a UCC-1 on all assets of

13  Northside Market, a third Deed of Trust on the borrower's single family residence, and a third Deed

14  of Trust on the guarantor's single family residence. The Bank's review and/or analysis of the

15  collateral securing the loan was insufficient. Although the loan was secured, in part, by a UCC-1 on

16  all assets of Northside Market, apparently, there was no inventory inspection of the assets of

17  Northside Market before the loan was originated. Likewise, the valuation of the guarantor's single

18  family residence was also deficient because it based upon a zillow.com estimate dated May 1, 2006.

19  This was an insufficient and improper property valuation as the loan policy in effect when the loan

20  was originated required either: (i) a site visitation report from the lending officer, (ii) a property tax

21  evaluation, or (iii) a broker's price opinion. Mok and Won approved the loan. This loan was

22  approved despite prior regulatory warnings concerning material deficiencies in underwriting, contrary

23  to safe and sound banking principles, and in violation of Innovative's loan policies which required,

24  among other things, an inspection and analysis of the value of guarantor's residential property (rather

25  than reliance on a zillow.com report). The loan went into default as of November, 2006, just five

26  months after being made, and the vast majority of the loan was ultimately charged off in March,

27  2009.

28

-14-

**f. Silverstar Family, Inc.**

67.     On October 29, 2007, the Bank made a five-year, $110,000 commercial loan to Silverstar Family, Inc., to purchase an existing high-end restaurant business known as the Old Post Office Seafood and Grill. The credit recommendation prepared by the loan officer identified significant red flags, including that restaurant sales had been declining for the past three years under the prior ownership, the guarantor had a below average credit score, and the onsite manager for the restaurant had been hired at an unsustainably high salary. Moreover, key members of the proposed management team had not been hired, and those that were in place lacked relevant experience and a proven track record. Notwithstanding these risks, the loan was approved by the four Officer Defendants based on collateral with a liquidation value of only $1,442, and no other viable secondary source of repayment. This loan was approved despite prior regulatory warnings concerning material deficiencies in underwriting, contrary to safe and sound banking principles, and in violation of Innovative's loan policies which required, among other things, approval of a complete, experienced and qualified management team, a viable secondary source of repayment, and a guarantor's documented and demonstrated ability to repay the loan. The borrower made no loan payments after May, 2008.

**g. AMC Petrolium**

68.     On April 15, 2008, the Bank extended a six-month, $165,586.83 loan to AMC Petrolium to defer accrued interest on a $4,300,000 construction loan. The construction loan in the amount of $4,300,000 was originated in November, 2005 to assist the borrower in demolishing an existing car wash and convenience-store facility and constructing a gas station with a larger convenience store, as well as a new fully-automated car wash, a restaurant, and a coin laundry. The collateral on the new six-month loan was a junior position on all assets of AMC Petrolium. Hong, Mok and Chiu approved the credit recommendation for the deferred interest loan on April 7, 2008, when the construction loan was already 103 days past due, so the junior position on all assets of AMC Petrolium offered little protection. This loan was approved despite prior regulatory warnings concerning material deficiencies in underwriting, contrary to safe and sound banking principles, and in violation of Innovative's loan policies which provided, among other things, that loans should not

-15-

be extended to bring delinquent debt current. By June, 2008, the loan was already in default. At the end of the six-month term, during which sporadic loan payments were received, a six-month extension was granted. Only one payment was made after this extension, and the loan was moved to non-accrual status on April 27, 2009.

**h.    Up Style, Inc.**

69.    On June 23, 2009, the Bank extended a loan to Up Style, Inc. to restructure two problem loans held by Innovative by consolidating the existing notes to a new three-year $182,000 term loan amortized over five years. Up Style, Inc. was engaged in the manufacturing and wholesaling of women's apparel, and was the successor to RB &W, Inc., which was established in June, 2003. On June 17, 2009, Mok and Chiu, along with Defendant Chong Kim who was serving as a member of the MLC, approved this new loan, despite significant red flags. First, there was no evidence of industry experience on the part of the new owners. Second, the Bank allowed personal guarantors who apparently had a negative net worth. Third, this restructuring did not enhance the likelihood of repayment. In fact, the restructuring significantly reduced the chance for repayment as the Bank released a deed of trust and a personal guaranty that previously had served as collateral. Fourth, the Bank relied on grossly inadequate operating information, including an unaudited and undated pro-forma 12 month projection. Finally, the loan file did not indicate any analysis of inventory or other collateral. This loan was approved despite prior regulatory warnings concerning material deficiencies in underwriting, contrary to safe and sound banking principles, and in violation of Innovative's loan policies which required, among other things, approval of a complete, experienced and qualified management team, verification of inventory or accounts receivable as a means of repayment, a guarantor's documented and demonstrated ability to repay the loan, and that restructurings should be only undertaken when it increased the borrower's likelihood of repayment. Three attempts at site visits during August, 2009 found the business closed. No payments were ever made, the loan was in default as of July 23, 2009, and the entire $182,000 balance of the loan was written off on October 20, 2009, just four months after the loan was originated. The Bank was unable to proceed against the collateral or the personal guarantor that had been released four months earlier.

-16-

### i. Caltra, Inc.

70.     On May 29, 2007, the Bank extended a $1 million, 12-month, revolving line of credit loan to Caltra, Inc. The line paid off a similar loan from another bank, and virtually the entire loan was disbursed at loan inception to pay off the other bank. The stated purpose of the loan was to provide working capital for the borrower to continue purchasing imported Korean food, beverages and alcoholic beverage products for re-sale to restaurants and grocery stores catering to Korean populations in California, Arizona and neighboring states. The repayment of the line was to come from conversion of accounts receivable to cash. The loan was approved by Hong and Chiu although the agreement lacked a debtor repayment program that was appropriate for accounts receivable and inventory financing, and had no requirement for regular inventory inspections, although inventory was pledged as collateral. This loan was approved despite prior regulatory warnings concerning material deficiencies in underwriting, and contrary to safe and sound banking principles. Despite the fact that no principal repayments had been made in the first 12-month loan term, and adequate collection procedures had not been established, three of the Officer Defendants renewed the loan in May, 2008, initially for three months, then for an additional 12 months on October 24, 2008. In June, 2009, the borrower reportedly lost the exclusive right to distribute the product that accounted for 60% of revenue, and the loan when into default for the first time. In July, 2009, the Bank discovered that Caltra had suspended operations, and in the previous months the borrower had liquidated the bulk of the inventory and collected a significant portion of accounts receivable, but had not repaid the loans secured by those assets. Although the borrower had cured the June, 2009 default, it defaulted again in September, 2009. The entire balance was written off by November, 2009.

### j. Vineyard Technologies, Inc.

71.     On July 2, 2007, the Bank extended a loan in the amount of $500,000 to Vineyard Technologies, Inc. ("Vineyard") to: (i) pay off a $199,000 loan from Wells Fargo, (ii) provide working capital to finance Borrower's accounts payable, and (iii) to enable Borrower to purchase inventory until accounts receivable were collected. Although loan repayment sources were listed as the business cash flow, liquidation of pledged collateral and the enforcement of the personal guaranty, the credit recommendation noted that Vineyard had a total negative net worth of $33,831

-17-

for 2003, $250,410 for 2004, and $784,935 for 2005. Despite Vineyard's deteriorating financial condition, the Bank's credit recommendation framed Borrower's dire situation in a positive light, stating "However, in consideration that the loans from shareholders are [from] the 100% owner of the corporation, when added back, the [Vineyard's] net worth is $545,000." In addition to glossing over Vineyard's negative net worth, the Bank failed to properly value the real property collateral, which served as the secondary source of repayment of the loan, by valuing the real property collateral based upon the original purchase price of the property instead of ordering a formal appraisal to determine the actual value of the property. All four Officer Defendants approved this loan. This loan was approved despite prior regulatory warnings concerning material deficiencies in underwriting, contrary to safe and sound banking principles, and in violation of Innovative's loan policies which required, among other things, analysis and documentation of the primary and secondary sources of repayment. In early 2008, the borrower began defaulting on its payment obligations.

### k.    Crystal Candy, Inc.

72.    On August, 2007, the Bank extended a $350,000, one-year, interest-only revolving line of credit to Crystal Candy, Inc. The purpose of the loan was to provide a working capital credit line for a women's junior apparel manufacturer and wholesaler located in Los Angeles, California. Collateral for the Crystal Candy, Inc. loan consisted of UCC-1 first position on all business assets of Crystal Candy, Inc., as well as a third Deed of Trust on rental property. The four Officer Defendants approved the loan notwithstanding the significant underwriting risks, including the lack of an inventory inspection of the pledged inventory collateral prior to loan approval, and the lack of a debtor repayment program that was appropriate for the risk associated with accounts receivable and inventory financing. Moreover, the loan was extended twice for a total of five months without adequate evaluation of the individual and corporate financials of the borrower. This loan was approved despite prior regulatory warnings concerning material deficiencies in underwriting, contrary to safe and sound banking principles, and in violation of Innovative's loan policies which required, among other things, an inspection and analysis of inventory. The loan defaulted in January, 2009.

73.    Notwithstanding the evident risks, each of the eleven Commercial Target Loans was approved by the MLC. Had the Officer Defendants heeded regulatory warnings and insisted on

-18-

compliance with lending policies and safe and sound banking principles, or had the Director Defendants heeded regulatory warnings and exercised even scant supervision of the lending programs, these loans would not have been made.

74.     As a result of the improper approvals by the MLC, the Director Defendants' failure to supervise, and other acts of negligence, gross negligence, and breach of fiduciary duty as alleged herein, the FDIC has suffered losses on these eleven Commercial Target Loans in an amount to be proven at trial but expected to exceed $3.8 million.

2.     <u>SBA Lending</u>

75.     All references to "Director Defendants" in this Section C.2. include Director and Officer Defendant Hong.

76.     The Director Defendants were grossly negligent in their failure to supervise the SBA lending program over which Jimmy Kim was given virtually exclusive authority with no supervision. Specifically, Defendant Jimmy Kim was allowed to originate, recommend, and approve the SBA Target Loans. All of the SBA Target Loans were made without proper underwriting and in violation of the Bank's loan policies, and with disregard to the warnings of the Bank's examiners.

77.     All of the SBA Target Loans were made after the Director Defendants had received regulatory warnings on January 31, 2006, about management's poor supervision of the SBA program.

78.     Hong and the other Director Defendants were grossly negligent and failed to meet their fiduciary duties by continuing to ignore the regulators' warnings and prudent underwriting standards.

79.     All but 7 of the 43 target loans were made after the November 8, 2006, meeting at which the Defendants were told that the Bank was being downgraded to a composite CAMELS 4 rating.

80.     The SBA loan to CK and LK Investment, Inc. ("CKLK") originated by Jimmy Kim in December 2006 provides a clear example of the complete lack of loan analysis demonstrated throughout the SBA lending program. On December 21, 2006, after the Bank had received a composite CAMELS 4 rating, the Bank funded a $260,000 SBA loan to CKLK to finance the purchase of an existing restaurant/bar known as the Capital Club in Seattle, Washington. Kim had

-19-

1  approved the credit recommendation on December 14, 2006. At the time of the loan application, the

2  principal and guarantor on the loan, Sunhah Choi, had total liquid assets of $936, and a pro-forma

3  balance sheet reflected negative working capital of $7,280. This loan went into default. Had the

4  Director Defendants shown even scant care by heeding regulatory warnings and requiring a thorough

5  review of the loan file, they would have discovered the negligent underwriting as well as numerous

6  indicators of fraud subsequently identified in a forensic loan review ordered by the Bank after Kim's

7  resignation, including that the signatures on loan applications and financial statements did not match

8  tax returns or closing documents and that the seller's name was misspelled on financial statements. It

9  was also discovered that Jimmy Kim failed to reveal an existing business relationship (or

10  relationships) between him and Sunhah Choi.

11      81.    Similarly, had the Director Defendants shown even scant care by heeding regulatory

12  warnings and requiring a thorough review of the SBA Target Loan files prior to approval, they would

13  have discovered the negligent underwriting as well as numerous indicators of fraud subsequently

14  identified in a forensic loan review ordered by the Bank after Kim's resignation, including that the

15  signatures on loan applications and financial statements did not match tax returns or closing

16  documents and that the seller's name was misspelled on financial statements.

17      82.    Despite internal red flags about numerous irregularities in the SBA program and the

18  regulators' continued warnings about the deficiencies within the Bank's SBA lending function, the

19  Director Defendants failed to exercise even scant oversight of the SBA program.

20      83.    Jimmy Kim was allowed either actual or de facto unilateral authority to approve SBA

21  loans with significant underwriting deficiencies, including borrowers with negative working capital;

22  guarantors with inadequate liquidity and/or assets; incorrect financial statements; inconsistencies

23  between financial statements and tax returns; and altered or forged loan documents, which furthered

24  his own financial gain.

25      84.    The Director Defendants' failings with respect to the SBA program also did not

26  comport to FDIC Risk Management Policies, which require directors to promulgate and ensure

27  compliance with loan policies, particularly when regulatory warnings have been issued. In this case,

28

-20-

the Director Defendants also failed to promulgate loan policies specifically for SBA loans, much less ensure their implementation.

85.    Improprieties in the operation of the Bank's SBA program were widespread and pervasive, and there is evidence of improper underwriting within at least the forty-three loans identified in the chart below, all of which would have been discovered at the time the loans were being considered for approval had the Director Defendants not been negligent, grossly negligent and in breach of their fiduciary duties in regard to supervising the SBA lending program.

| Borrower | Funding Date | Loan Amount |
|---|---|---|
| 1.  Koval's Trade Market | May 1, 2006 | $920,000 |
| 2.  Prudential Dental Lab | June 29, 2006 | $1,050,000 |
| 3.  Friendly Duck | July 5, 2006 | $200,000 |
| 4.  County Line Restaurant | July 11, 2006 | $250,000 |
| 5.  Steak Escape | July 13, 2006 | $100,000 |
| 6.  Dmk Creative Inc. | August 3, 2006 | $200,000 |
| 7.  Nifty Fifty's | October 20, 2006 | $1,075,000 |
| 8.  CK&LK Investment, Inc. | December 21, 2006 | $260,000 |
| 9.  Joon & Erin Chung | January 30, 2007 | $800,000 |
| 10. Sun Cleaners Iii | March 16, 2007 | $630,000 |
| 11. Almanor Pines Market | March 19, 2007 | $1,320,000 |
| 12. Mug And Mouse - Frisco | March 27, 2007 | $100,000 |
| 13. Piccomolo Ne Mall | May 4, 2007 | $210,000 |
| 14. Spanaway Food Mart | June 6, 2007 | $429,000 |
| 15. Master Grill | June 13, 2007 | $600,000 |
| 16. Kool | June 29, 2007 | $915,000 |
| 17. Wa Sushi Teppanyaki | July 12, 2007 | $280,000 |
| 18. 50th St Market | July 13, 2007 | $200,000 |
| 19. News Cafe And Sushi | August 9, 2007 | $315,000 |
| 20. David Hyun Md | August 13, 2007 | $1,400,000 |
| 21. Natural Cleaners | October 1, 2007 | $240,000 |
| 22. Don Doeji | October 11, 2007 | $260,000 |
| 23. Chaucers Sushi And Grill | October 31, 2007 | $370,000 |
| 24. E-Hwa Jong | November 7, 2007 | $180,000 |
| 25. Charnmeyville Car Wash | November 8, 2007 | $2,000,000 |
| 26. Rowland Heights Golf | December 20, 2007 | $150,000 |
| 27. Boba Boom | December 28, 2007 | $82,000 |
| 28. Lead Consulting LLC | February 4, 2008 | $1,520,000 |
| 29. Master Grill Brazilian | February 5, 2008 | $805,000 |
| 30. Chaucer's Sushi and Grill | March 20, 2008 | $875,000 |
| 31. Murphy's Deli | April 18, 2008 | $120,000 |
| 32. Soul Restaurant | April 24, 2008 | $400,000 |

-21-

| Borrower | Funding Date | Loan Amount |
|---|---|---|
| 33. Lakeside Cleaners | June 11, 2008 | $1,135,000 |
| 34. Honmachi | June 23, 2008 | $550,000 |
| 35. Sik Kaek | July 18, 2008 | $110,000 |
| 36. Chung Sa Cho Rong | July 21, 2008 | $360,000 |
| 37. Dba Miso Sushi | August 8, 2008 | $274,000 |
| 38. Quiznos Sub | August 26, 2008 | $180,000 |
| 39. Together Karaoke | October 6, 2008 | $200,000 |
| 40. New China Gate Seafood | October 14, 2008 | $181,000 |
| 41. Family Market | October 28, 2008 | $200,000 |
| 42. Caltra Inc | November 4, 2008 | $256,000 |
| 43. Ce Fiore | June 4, 2009 | $150,000 |

86.     As a result of the Director Defendants' negligence, gross negligence and breaches of fiduciary duty, the FDIC as Receiver for Innovative has suffered losses on these loans in an amount to be proven at trial, but is expected to exceed $3.3 million.

3.     Jimmy Kim

87.     Defendants Hong and Cho reasonably should have known or discovered that before coming to work for Innovative, Jimmy Kim had been terminated from Wilshire State Bank ("Wilshire") due to irregularities in connection with his involvement with its small business lending program.

88.     Defendant Cho, who was instrumental in hiring Jimmy Kim, had close connections with Wilshire and could have inquired about the circumstances of Kim's departure from Wilshire.

89.     Over the three-plus years Jimmy Kim acted as the Bank's SBA Loan Manager, he did in fact perpetrate a massive fraud that caused the Bank millions of dollars in losses.

90.     Under Jimmy Kim's management, the Bank originated SBA 7(a) (the most basic and common form of SBA guaranteed loans) and Small Office/Home Office ("SOHO") loans at an extremely high volume.

91.     During the first year in which Kim worked at the Bank, due to the compensation structure in place, at times, he was reported to have earned monthly commissions in excess of $100,000.

92.     Jimmy Kim and Jenny Shinn ("Shinn"), the First Vice President and Manager of the

-22-

Note Department, and others, acting in collusion with parties including borrowers, loan brokers, and technical assistance providers, caused the Bank to extend many millions of dollars in SBA loans that absent fraud would not have qualified for the program.

93. In connection with this fraudulent scheme, Kim, Shinn and/or others instructed Innovative employees to forge and alter loan documents, apparently including loan applications, tax returns and other tax related forms, pro-forma income statements, financial statements, letters of intent, leases, and other key documents supporting loan applications.

94. Hong and Cho were negligent and grossly negligent for retaining Jimmy Kim as a bank officer when they failed to inquire into the reasons for his being terminated at his previous place of employment while conducting an internal investigation of the small business lending program.

## VI.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF – BREACH OF FIDUCIARY DUTIES
### (AGAINST ALL DEFENDANTS)

95. Plaintiff incorporates herein by reference all of the foregoing paragraphs of this Complaint as though fully set forth herein.

96. During all or part of the relevant times, Defendants Hong, Mok, Chiu, Won, Chong Kim, and Jimmy Kim were officers of Innovative. Defendants An, Chang, Cho, Harry Choi, Yong Choi, Hong, Huey, Chong Kim, Jung Kim, and Patel were directors of Innovative.

97. As directors and officers, Defendants owed fiduciary duties of care and loyalty to Innovative to act with the utmost care and in the best interests of the Bank, which included, but was not limited to, adhering to safe and sound lending practices, conforming to the Bank's loan policy, and supervising management in the implementation and operation of lending policies to protect the Bank against excessive risk. That, in turn, included but was not limited to a duty to ensure that management designed and implemented lending policies that complied with safe and sound lending practices, particularly in light of regulatory warnings. These duties included, but were not limited to, the following:

a)   To communicate to the Bank's loan officers and underwriters a clear expectation that they must adhere to sound lending policies and credit procedures by establishing a

-23-

1    system of checks and balances and by careful monitoring of loan officers' conduct;

2    b)    To require that sufficiently detailed, current and reliable information be provided upon
3          which the directors and officers could make prudent decisions;

4    c)    To enforce policies and procedures designed to ensure that loans would not be made
5          based on inadequate or inaccurate information;

6    d)    To carefully review reports of examinations and other directives of regulatory
7          agencies, to carry out the instructions and orders contained in those reports, to
8          investigate and cure problems noted therein, and to prevent any repetition of such
9          problems and deficiencies;

10   e)    To inform themselves about proposed loans and the risks the loans posed to the Bank
11         before they determined whether to approve them;

12   f)    To properly supervise the lending function and lending program;

13   g)    To approve and/or ratify only those loans that conformed with the Bank's loan
14         policies;

15   h)    To ensure that any loans they approved and/or ratified were underwritten in a safe and
16         sound manner;

17   i)    To ensure that loans they approved were secured by sufficiently valuable collateral to
18         prevent or minimize the risk of loss to the Bank; and

19   j)    To ensure that the Bank had sufficient, capable personnel to undertake and administer
20         the lending policies.

21   98.   Defendants breached their fiduciary duties by, among other things:

22   a)    Failing to supervise management in the implementation and operation of the Bank's
23         lending policies to ensure they met appropriate standards;

24   b)    Causing or allowing the Bank to make commercial loans with little or no regard for
25         borrowers' ability to repay them;

26   c)    Failing to ensure proper review and approval of the SBA loans, which comprised a
27         significant portion of the Bank's total loan portfolio, despite regulatory criticism;

28   d)    Failing to properly supervise the SBA lending program despite regulatory criticism;

-24-

e)     Failing to verify stated income and stated asset information in loan applications despite the clear risks that this practice would lead to inaccurate or fraudulent loan applications and supporting documents;

f)     Failing to ensure that loans, including the Target Loans, were underwritten in a safe and sound manner;

g)     Failing to ensure that loans, including the Target Loans, were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and

h)     Failing to take action to prevent the reoccurrence of any unsafe or unsound banking practice that came to their attention, including, but not limited to, multiple and repeated warnings from the CDFI and the FDIC about the various deficiencies noted above.

99.     Defendants Hong and Cho breached their duties of care in their hiring of Jimmy Kim to head the Bank's SBA loan program, when they reasonably should have known or discovered that he was terminated from his prior employer bank because of his involvement in a small business loan scheme.

100.     Defendants Hong and Cho breached their duties of care in their retaining of Jimmy Kim as head the Bank's SBA loan program, when they reasonably should have known or discovered that he was terminated from his prior employer bank because of his involvement in a small business loan scheme, and in light of internal warnings and red flags.

101.     The Director Defendants breached their fiduciary duties by failing to supervise the Bank's SBA loan program, including failing to act on repeated regulatory warnings and internal red flags, and their failure to adopt and implement appropriate and necessary SBA loan policies in response to regulatory criticisms that would have prevented or substantially limited the Bank's losses incurred as a direct result of the deficient SBA credits and/or Jimmy Kim's fraudulent conduct.

102.     Jimmy Kim, as an officer of the Bank, also breached his fiduciary duties of care and loyalty to the Bank through his willful misconduct in the management of the SBA loan program through which he promoted his own financial gain to the detriment of the Bank.

103.     As a direct and proximate result of Defendants' breach of fiduciary duties, the FDIC,

-25-

as receiver of Innovative suffered damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF – GROSS NEGLIGENCE

## (AGAINST ALL DEFENDANTS)

104.    Plaintiff incorporates herein by reference all of the foregoing paragraphs of this Complaint as though fully set forth herein.

105.    Section 1821(k) of FIRREA holds directors and officers of financial institutions personally liable for loss or damage to the institution caused by their "gross negligence," as defined by applicable state law. California law defines gross negligence as either a want of scant care or an extreme departure from the ordinary standard of care.

106.    Defendants owed Innovative a duty of care to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances.

107.    The duty of care for the Officer Defendants included, but was not limited to, the following:

a)      To inform themselves about proposed loans and the risks the loans posed to the Bank before they approved them;

b)      To approve loans that conformed with the Bank's loan policy;

c)      To ensure that any loans they approved were underwritten in a safe and sound manner; and

d)      To ensure that any loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank.

108.    The duty of care for the Director Defendants included, but was not limited to, the following:

a)      To respond to the serious regulatory warnings by exercising heightened oversight with respect to the commercial lending function, and not simply rely on management and underwriting which they had already been advised was grossly deficient; and

b)      To respond to the regulatory warnings and other internal red flags concerning the SBA lending program by exercising heightened oversight, and not allow Jimmy Kim nearly

-26-

1    unfettered discretion with respect to SBA lending.

2    109.    Each Defendant was grossly negligent in that their manner of carrying out their duties

3    and responsibilities to the Bank constituted a want of scant care or an extreme departure from the

4    ordinary standard of care, as further described in this Complaint and by:

5        a)    Failing to inform themselves about the risks the Target Loans posed to the Bank

6              before they approved them or allowing them to be approved;

7        b)    Approving or allowing the approval of the Target Loans with terms inconsistent with

8              the Bank's Loan Policy;

9        c)    Failing to ensure that the Target Loans were underwritten in a safe and sound manner;

10       d)    Failing to ensure that the Target Loans were secured by sufficiently valuable collateral

11             to prevent or minimize the risk of loss to the Bank;

12       e)    Failing to respond to serious regulatory warnings by exercising heightened oversight

13             with respect to the commercial lending function and instead continuing to rely on

14             management and underwriting that they had previously been advised were grossly

15             deficient; and

16       f)    Failing to respond to the regulatory warnings and other internal red flags concerning

17             the SBA lending program by exercising heightened oversight with respect to Jimmy

18             Kim.

19   110.    As a direct and proximate result of Defendants' gross negligence, Innovative suffered

20   damages in an amount to be proven at trial, in excess of $7.1 million.

21                   **THIRD CLAIM FOR RELIEF – GROSS NEGLIGENCE**

22                        **(AGAINST ALL DIRECTOR DEFENDANTS)**

23   111.    Plaintiff incorporates herein by reference all of the foregoing paragraphs of this

24   Complaint as though fully set forth herein.

25   112.    The Director Defendants had duties to the Bank independent and apart from any

26   review and approval of particular loans. The Director Defendants had the duty under California law

27   to supervise, monitor and oversee the officers of the Bank. Directors cannot ignore what is going on

28   around them. It is their duty to use ordinary diligence in ascertaining the condition of the Bank's

-27-

1    business, and to exercise reasonable control and supervision of its officers.

2         113.    The Director Defendants breached these duties in numerous ways, as described more
3    particularly herein, including the failure to supervise the officers of the Bank, especially given their
4    heightened obligations to do so after explicit regulatory warnings as to the serious underwriting
5    deficiencies at the Bank. Among the grossly negligent acts by Director Defendants were their failure
6    to reasonably inform themselves about the lending activities of the Officer Defendants to be able to
7    exercise their judgment in a reasonable and deliberate manner, their failure to act in the best interests
8    of the Bank, and their failure to otherwise meet the requirements of Corporation Code § 309(a).

9         114.    The Director Defendants' failure to supervise the officers of the Bank, as described
10   herein, demonstrates a want of scant care and an extreme departure from the ordinary standard of
11   care.

12        115.    The grossly negligent failure to oversee the Bank proximately caused significant
13   damages to the Bank. The failure to supervise was a substantial factor in permitting the officers to
14   operate the Bank in a negligent and unsafe manner. As a direct and proximate result of the grossly
15   negligent conduct of the Director Defendants, Innovative suffered damages in an amount to be
16   proven at trial, in excess of $7.1 million.

17                    **FOURTH CLAIM FOR RELIEF – NEGLIGENCE**

18                    **(AGAINST THE OFFICER DEFENDANTS)**

19        116.    Plaintiff incorporates herein by reference all of the foregoing paragraphs of this
20   Complaint as though fully set forth herein.

21        117.    Defendant Chong Kim, during the period of time he was an officer of the Bank,
22   Jimmy Kim, and the Officer Defendants, acting in their capacity as officers of Innovative, owed to
23   Innovative the duty to use reasonable care, skill and diligence in the performance of their duties,
24   especially in connection with the Bank's commercial lending functions. These duties included, but
25   were not limited to, the following:

26        a)      To inform themselves about proposed loans and the risks the loans posed to the Bank
27                before they approved them;

28        b)      To approve loans that conformed with the Bank's loan policy;

                                                   -28-

c) To ensure that any loans they approved were underwritten in a safe and sound manner; and

d) To ensure that any loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank.

118. Defendant Chong Kim, during the period of time he was an officer of the Bank, Jimmy Kim, and the Officer Defendants, acting in their capacity as officers of Innovative, were negligent by abdicating their responsibilities to the Bank, unreasonably failing to investigate material facts, failing to use their business judgment in carrying out their responsibilities to the Bank, approving loans contrary to safe and sound banking practices, and in violation of the Bank's loan policies, as further described in this Complaint, in connection with the Bank's commercial and SBA lending functions. These breaches of duty are exemplified by the Target Loans described herein.

119. As a direct and proximate result of Officer Defendants' and Jimmy Kim's negligence, including that of Chong Kim during the period of time he was an officer of the Bank, Innovative suffered damages in an amount to be proven at trial, in excess of $7.1 million.

## FIFTH CLAIM FOR RELIEF - FRAUD
## (AGAINST DEFENDANT JIMMY KIM)

120. Plaintiff incorporates herein by reference all of the foregoing paragraphs of this Complaint as though fully set forth herein.

121. Jimmy Kim fraudulently caused the Bank to extend many millions of dollars in SBA loans that without fraud would not have qualified for the program.

122. Jimmy Kim committed fraud in order to promote his own financial gain.

123. Jimmy Kim knew that these loans were improper and were made in violation of the Bank's policies and federal lending standards.

124. Jimmy Kim approved and caused the Bank to fund the SBA Target Loans with the intention to deceive and defraud the Bank.

125. In connection with this fraudulent scheme, Jimmy Kim instructed Innovative employees to forge and alter loan documents, including loan applications, tax returns and other tax related forms, pro-forma income statements, financial statements, letters of intent, leases, and other

-29-

key documents supporting loan applications.

126. Jimmy Kim intended the Bank to rely on these fraudulent documents.

127. The SBA-related fraud perpetrated by Kim was widespread and pervasive, and there is evidence of fraud at least within the forty-three loans identified in the chart at paragraph 85.

128. As a direct and proximate result of Jimmy Kim's fraudulent conduct, as alleged herein, the FDIC, as receiver of Innovative suffered damages in an amount of at least $3.1 million to be proven at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff the FDIC requests relief from Defendants as follows:

A.  For compensatory and consequential damages, jointly and severally, in a minimum amount of $7.1 million and any excess amount to be proven at trial;

B.  For its costs of suit against all Defendants;

C.  For prejudgment interest;

D.  For attorneys' fees, and costs for the investigation and litigation; and

E.  For such other and further relief as this Court deems just and proper.

DATED: May 23, 2012

Respectfully submitted,

NIXON PEABODY LLP

By: _____
Anthony J. Barron
abarron@nixonpeabody.com
Attorney for Plaintiff
FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INNOVATIVE BANK

-30-

## DEMAND FOR JURY TRIAL

Plaintiff the FDIC hereby demands trial by jury in this action.

DATED: May 23, 2012

NIXON PEABODY LLP

By: _____
Anthony J. Barron
abarron@nixonpeabody.com
Attorney for Plaintiff
FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INNOVATIVE BANK